# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| R. ALEXANDER ACOSTA, Secretary of Labor, United States Department of Labor, | : : : |
| Plaintiff, | : CASE NO. 1:17-cv-00923 : |
| v. | : : : |
| UNITED TRANSPORTATION UNION; INTERNATIONAL ASSOCIATION OF SHEET METAL AIR, RAIL, TRANSPORTATION WORKERS; INTERNATIONAL ASSOCIATION OF SHEET METAL AIR, RAIL, TRANSPORTATION WORKERS – TRANSPORTATION DIVISION; JOHN PREVISICH; JOSEPH SELLERS; RICHARD MCCLEES; MALCOLM FUTHEY; AND JOSEPH NIGRO; THE SMART GROUP VSTD PLAN, | : JUDGE SOLOMON OLIVER, JR. : : : : : : : : : : : : |
| Defendants. | : : |

## FIRST AMENDED COMPLAINT

Plaintiff, R. Alexander Acosta, Secretary of Labor, United States Department of Labor (the "Secretary"), alleges:

1. This action arises under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1001, *et seq.*, and is brought by the Secretary under ERISA §§502(a)(2) and (5), 29 U.S.C. §§1132(a)(2) and (5), to enjoin acts and practices that violate the provisions of Title I of ERISA; to obtain appropriate equitable relief for breaches of fiduciary duty under ERISA §409, 29 U.S.C. §1109; and to obtain such further equitable relief as may be appropriate to redress violations and to enforce the provisions of Title I of ERISA.

2. This Court has jurisdiction over this action pursuant to ERISA §502(e)(1),

29 U.S.C. §1132(e)(1).

3. Venue of this action lies in the Northern District of Ohio, pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the ERISA-covered employee welfare plan involved in this matter is administered in Cuyahoga County, Ohio, within this district.

## DEFENDANTS

4. Until 2011, the United Transportation Union ("UTU") was an employee organization who represented transportation workers in collective bargaining matters with their respective employers. UTU was based in North Olmsted, Ohio.

5. On January 1, 2010, UTU sponsored the establishment of the UTU Group Voluntary Short Term Disability Plan ("UTU VSTD Plan") to provide short-term disability insurance benefits to participants of the Plan. The UTU VSTD Plan was funded through payroll withholdings that were withheld from participants' paychecks through employer withholdings.

6. The UTU VSTD Plan was an employee welfare plan within the meaning of ERISA §3(1), 29 U.S.C. §1002(1), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

7. In 2011, UTU merged with the Sheet Metal Workers' International Association ("SMWIA"), another employee organization, to form a new, third entity known as the International Association of Sheet Metal Air, Rail, Transportation Workers ("SMART"). SMART is an employee organization headquartered in Washington, D.C.[1]

8. When UTU merged with SMWIA, SMART created a division, located in

---

[1] Upon information and belief, the merger may have occurred in 2008, but ensuing litigation may have caused the merger to become official in late 2011.

North Olmsted, Ohio, called the International Association of Sheet Metal Air, Rail, Transportation Workers - Transportation Division ("SMART-TD").[2]

9. Upon information and belief, SMART-TD was intended to continue the union activities of the defunct UTU.

10. On February 1, 2014, the name of the UTU VSTD Plan was changed to the SMART Group VSTD Plan (hereinafter, the term "Plan" will mean the UTU VSTD Plan and its successor, the SMART Group VSTD Plan). The Plan continued (and continues to the present day) to provide short-term disability insurance benefits to participants in the Plan.

11. The Plan is funded through payroll withholdings that were withheld from participants' paychecks through employer withholdings. The Plan is an employee welfare plan within the meaning of ERISA §3(1), 29 U.S.C. §1002(1), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

12. The Plan is joined as a party defendant in this action pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

13. From January 1, 2010, through January 1, 2012, UTU was the Plan Sponsor, Plan Administrator, and a fiduciary of the UTU VSTD Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) and a party in interest to the Plan within the meaning of ERISA §§3(14)(A); 29 U.S.C. §§1002(14)(A).

14. From January 1, 2012, through May 31, 2015, the Union was the Plan

---

[2] Unless otherwise specified in this Complaint, the Secretary will use the term "Union" to mean UTU, SMART, and/or SMART-TD. The Secretary's pre-litigation investigation of this matter suggested that representatives of these entities often use these labels interchangeably.

Sponsor, Plan Administrator, and was a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

15. Beginning on June 1, 2015, the Union ceased being the Plan Administrator. Instead, the Board of Trustees for the Plan became the Plan Administrator.

16. Since April 29, 2013, through the present, Defendant John Previsich has served as the President of the SMART-TD and as a Plan trustee and therefore he is a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) and a party in interest to the Plan within the meaning of ERISA §3(14)(A) and (H); 29 U.S.C. §1002(14)(A) and (H).

17. Since January 15 2014, through the present, Defendant Joseph Sellers has been a Plan trustee and therefore a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A). Since January 15, 2014, Defendant Sellers also has served as an officer of the Union. Defendant Sellers has served as the General President of SMART since May 1, 2015. As early as January 15, 2014, and until he assumed the position of General President, Defendant Sellers served as the General Secretary-Treasurer of SMART. As a Plan trustee and fiduciary to the Plan, and as an officer of the Union, Defendant Sellers is also a party in interest to the Plan within the meaning of ERISA §3(14)(A) and (H); 29 U.S.C. §1002(14)(A) and (H).

18. Since January 15, 2014, through the present, Defendant Richard McClees has been a Plan trustee and therefore a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A). Since January 15, 2014, Defendant McClees has served as an officer and/or was an employee of the Union. Currently, Defendant

McClees serves as the General Secretary-Treasurer of SMART. As a Plan trustee and fiduciary to the Plan, and as an officer and/or employee of the Union, Defendant McClees is also a party in interest to the Plan within the meaning of ERISA §3(14)(A) and (H); 29 U.S.C. §1002(14)(A) and (H).

19. Between January 1, 2010, and September 30, 2013, Defendant Malcolm Futhey was the President of the Union, a trustee and fiduciary of the Plan, within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) and a party in interest to the Plan within the meaning of ERISA §3(14)(A) and (H); 29 U.S.C. §1002(14)(A) and (H). Although Defendant Futhey's tenure as a trustee and fiduciary of the Plan spanned from January 1, 2010, through September 30, 2013, the Secretary's allegations against Defendant Futhey only implicate him in his role as a trustee, fiduciary, and party in interest to the Plan from April 1, 2013, until September 30, 2013.

20. As early as January 24, 2014, Defendant Joseph Nigro held himself out as the Plan Administrator, which position was eliminated after May 31, 2015. Nigro also served as president of SMWIA beginning in July 2011, then later as president of the Union, until April 2015. Therefore, as early as January 24, 2014, and through May 31, 2015, Nigro was a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) and a party in interest to the Plan within the meaning of ERISA §3(14)(A) and (H); 29 U.S.C. §1002(14)(A) and (H).

## GENERAL ALLEGATIONS

### *The Union*

21. In 1970, the United Transportation Union Insurance Association ("UTUIA") was formed. It is a "fraternal benefit society" that sells various types of

insurance to Union members. Since the inception of the Plan until approximately 2013, UTUIA and the Union had the same individuals serving as their respective officers and board of directors.

22. During the relevant period, the Union has employed individuals to act as field supervisors. These individuals promote membership in the Union and assist in organizing activities.

23. Since at least 2009, UTUIA has contracted with the Union's field supervisors to sell UTUIA insurance products to Union members. The field supervisors are also responsible for soliciting, coordinating, maintaining, and collecting premiums for other non-Plan insurance products sold by UTUIA.

24. During the relevant time period, field supervisors were compensated for their work through compensation received directly from the Union and commissions on the sale of UTUIA's non-Plan insurance products.

25. The Union paid the field supervisors a flat monthly fee for work performed for the Plan, regardless of the number of Plan participants they worked with or the amount of time they expended on Plan-related tasks.

26. Prior to February 2012, the flat fee paid to the field supervisors was $3,000 per month. That fee was increased to $3,500 per month after February 2012.

27. During the relevant time period, the local unions employed local union treasurers. The local union treasurers, among other duties, collected employee withholdings from various employers and remitted these withholdings to the Union as contributions to the Plan.

### *Employee Withholdings – Participant Contributions*

28. During the relevant time, Plan participants authorized their employers to withhold various deductions from their paychecks. These deductions included, among other things, their contributions to various ERISA-covered employee benefit plans.

29. Since January 1, 2010, employers of employees who participate in the Plan have withheld money from their employees' wages for contribution to the Plan. These employee contributions were either remitted directly to the Union or to the local union treasurers, who would then forward the employee contributions on to the Union. These employee withholdings were plan assets – pursuant to 29 C.F.R. §2510.3-102(a)(1) – as soon as the employers could have segregated the withholdings from the employers' general assets.

30. Upon information and belief, the employers remitted the employee withholdings to the Union or local union treasurer, who would allocate then deposit the employee withholdings into a Union general account. The employee withholdings would remain in the Union's general account until such time as the Union had reconciled the withholdings.

31. The Plan charged each participant in the Plan a set monthly "premium" amount to participate in the Plan. The monthly rates that the Plan charged each participant equaled the employee contributions and were based on the occupation of the Union member and varied during the relevant time period, as follows:

| | |
|---|---|
| Rail Members: | Prior to 2012: $31.00 per month<br>After 2012: $34.50 per month |
| Bus Members: | Prior to March 1, 2012: $26.50 per month<br>Beginning on March 1, 2012: $26.00 per month |

32. The amounts remitted by the various employers of the Plan's participants for payment of the monthly "premium" charged by the Plan were deposited into a Union bank account. The Union would then usually send those funds to the Plan's account, then make various payments for Plan administration out of the Plan's account, including the transfer of money to the Union for alleged administrative services and to pay field supervisors and local union treasurers. On a few rare occasions, the money would remain in the Union's account until after the Union had paid field supervisors, local union treasurers, and itself, as well as the premiums to the insurance companies. Once those payments were made, the Union would transfer any remaining amounts to the Plan's account.

33. Since January 1, 2010, the Union has retained more than $7,000,000 dollars in employee withholdings intended as participant contributions to the Plan.

***Transfer of Plan Assets (January 1, 2010, through December 31, 2013)***

34. From January 1, 2010, through December 31, 2013, there was no written agreement between the Plan and the Union setting forth what administrative services would be provided by the Union and its employees to the Plan. Nor was there an agreement between the parties as to what the Union would charge the Plan for the provision of these services.

35. From January 1, 2010, through December 31, 2013, neither the Plan's Administrator nor the Plan's trustees engaged in due diligence with respect to the reasonableness of the fees charged by the Union to the Plan.

36. From January 1, 2010, through December 31, 2013, the Union charged the Plan $4 per participant per month for "administrative expenses".

37. Upon information and belief, the Union used these "administrative expenses" in the following manner:

 A.   $2 was either paid by the Plan to the Union, or retained by the Union in its own bank account, as a flat administrative fee;

 B.   $1 was used by the Union to pay commissions to the field supervisors;

 C.   $0.50 was used by the Union to pay for payroll taxes and fringe benefits for the Union's field supervisors; and

 D.   $0.50 was used by the Union to pay commissions and payroll taxes for the local union treasurers.

38. The "administrative expenses" retained by the Union from participant contributions to the Plan or paid to the Union directly from the Plan were approved by the Union, and/or by Defendants Previsich, Sellers, McClees, Futhey, and Nigro, during their tenures as trustees and/or fiduciaries to the Plan.

39. During the period January 1, 2010, through December 31, 2013, the Union did not maintain contemporaneous time records detailing what kind of services were provided to the Plan, when the services were provided, and which employees (including field supervisors and local union treasurers) provided these services to the Plan.

40. During the period of January 1, 2010, through December 31, 2013, when the Union used Plan assets to pay itself, field supervisors, and local union treasurers, the Union did not ensure that those payments were limited to reimbursement of direct expenses that were actually and properly incurred as a result of providing administrative services to the Plan.

41. During the period of January 1, 2010, through December 31, 2013, the Union did not maintain contemporaneous records detailing the arrangement for services that the field supervisors and local union treasurers would provide to the Plan.

9

### *Transfer of Plan Assets (January 1, 2014, through May 31, 2015)*

42. Sometime in 2014, four years after the Plan's inception, the Plan's fiduciaries had a time study conducted to determine the amount of time Union employees spent on Plan-related activities.

43. On September 17, 2014, the Plan and the Union executed an Administrative Service Agreement. The effective date of this agreement was January 1, 2014.

44. The Administrative Service Agreement provides that the Plan will pay the following fees to the Union:

   A. For each Union employee, the salary, payroll taxes, and costs of benefits attributable to the hours the employee devotes to administration of the Plan, as well as portions of equipment and other overhead used by such employee to provide such services;

   B. For each field supervisor, $3,500 per month, without regard to the amount of Plan-related work conducted by each field supervisor;

   C. For each local union treasurer, $0.50 per month for each member in the treasurer's local union whose account is handled by the treasurer, without regard to the amount of Plan-related work conducted by each local union treasurer.

45. From January 1, 2014, through May 31, 2015, the Union charged the Plan $4 per participant per month for administrative expenses.

46. From January 1, 2014, through May 31, 2015, neither the Plan's Administrator nor the Plan's trustees engaged in due diligence with respect to the

reasonableness of the fees charged to the Plan for payments to the field supervisors or the local union treasurers.

47. During the period January 1, 2014, through May 31, 2015, the Union did not maintain contemporaneous time records detailing what kind of services were provided to the Plan, when the services were provided, and which employees (including field supervisors and local union treasurers) provided these services to the Plan.

### *Transfer of Plan Assets (June 1, 2015, through the present)*

48. Beginning on June 1, 2015, the Union ceased acting as the Plan Administrator, and instead the Plan's Board of Trustees took over as the Plan Administrator.

49. From June 1, 2015, through the present, neither the Plan's Administrator nor the Plan's trustees engaged in due diligence with respect to the reasonableness of the fees charged to the Plan for payments to the field supervisors or the local union treasurers.

50. During the period January 1, 2014, through May 31, 2015, the Union did not maintain contemporaneous time records detailing what kind of services were provided to the Plan, when the services were provided, and which employees (including field supervisors and local union treasurers) provided these services to the Plan.

### ERISA VIOLATIONS

51. During the period from January 1, 2010, through December 31, 2013:

    A. The Union, Futhey, and Previsich – during their respective tenures as fiduciaries to the Plan – caused the Plan to pay the Union, field supervisors, and local union treasurers more than the reimbursement of direct expenses

actually and properly incurred as a result of providing administrative services to the Plan.

  B.  The Union, Futhey, and Previsich – during their respective tenures as fiduciaries to the Plan – caused the Plan to pay the Union, the field supervisors, and local union treasurers without reasonable arrangements in place for their provision of administrative services to the Plan.

  C.  Although the Union's payment of fees to itself, the field supervisors, and local union treasurers were ostensibly approved by Futhey and/or Previsich, they were officers of the Union and therefore had an inherent conflict of interest in the transaction.

52.  During the period from January 1, 2014, through May 31, 2015,:

  A.  The Union, Previsich, Sellers, McClees, and Nigro – during their respective tenures as fiduciaries to the Plan – caused the Plan to pay the Union, field supervisors, and local union treasurers more than the reimbursement of direct expenses actually and properly incurred as a result of providing administrative services to the Plan.

  B.  The Union, Previsich, Sellers, McClees, and Nigro – during their respective tenures as fiduciaries to the Plan – caused the Plan to pay the Union, field supervisors, and local union treasurers without reasonable arrangements in place for their provision of administrative services to the Plan.

53.  During the period from May 31, 2015, through the present:

  A.  Previsich, Sellers, and McClees caused the Plan to pay the field supervisors and local union treasurers without reasonable arrangements in place

for their provision of administrative services to the Plan.

      B.    Previsich, Sellers, and McClees caused the Plan to pay the field supervisors and local union treasurers more than the reimbursement of direct expenses actually and properly incurred as a result providing administrative services to the Plan.

54.    By the conduct described above, the Union, Futhey, Previsich, Nigro, Sellers, and McClees, during their respective tenures as fiduciaries of the Plan:

      A.    failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A);

      B.    failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B);

      C.    caused the Plan to engage in transactions which they knew or should have known constituted a furnishing of goods, services, or facilities between the Plan and a party in interest, in violation of ERISA §406(a)(1)(C), 29 U.S.C. §1106(a)(1)(C);

      D.    caused the Plan to engage in transactions which they knew or should have known constituted a direct or indirect transfer to, or use by or for the

benefit of, a party in interest, of assets of the Plan, in violation of ERISA §406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D);

    E.    dealt with assets of the Plan in their own interest or for their own account, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1); and

    F.    in their individual or other capacity acted in transactions involving the Plan on behalf of parties (or represented parties) whose interests were adverse to the interests of the Plan, or the interests of its participants or beneficiaries in violation of ERISA §406(b)(2), 29 U.S.C. §1106(b)(2).

55. To the extent the Union, Futhey, Previsich, Nigro, Sellers, and McClees, during their respective tenures as fiduciaries, did not directly authorize the Plan's payment of fees to the Union, the field supervisors, and/or the local union treasurers, they failed to act solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Plans' administration when they permitted the Plan to pay fees to the Union, field supervisors, and local treasurers, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A).

56. Pursuant to ERISA §§ 405(a)(1) through (3), 29 U.S.C. §§ 1105(a)(1) through (3), the Union, Futhey, Previsich, Nigro, Sellers, and McClees, during their respective tenures as fiduciaries, are liable for the breaches of their co-fiduciaries as described above because they knowingly participated in or concealed an act or omission of their co-fiduciaries, knowing that such act or omission was a breach; they enabled their co-fiduciaries to commit a breach by breaching their own fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1); and they had knowledge of a fiduciary breach

14

by their co-fiduciaries and did not make reasonable efforts under the circumstances to remedy it.

57. As a direct and proximate result of these breaches committed by defendants, the Plan has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA §409, 29 U.S.C. § 1109.

## **PRAYER FOR RELIEF**

WHEREFORE, the Secretary prays for judgment:

58. Permanently enjoining defendants from violating the provisions of Title I of ERISA;

59. Ordering defendants to make good to the Plan all losses, including lost opportunity costs, resulting from fiduciary breaches committed by defendants or for which defendants are liable;

60. Ordering defendants to correct the prohibited transactions in which they engaged, restore all losses to the Plan, and pay appropriate interest;

61. Ordering the defendants, as parties in interest, to disgorge all profits they received as a result of prohibited transactions in which they engaged;

62. Awarding the Secretary the costs of this action; and

63. Ordering such further relief as is appropriate and just.

KATE S. O'SCANNLAIN
Solicitor of Labor

CHRISTINE Z. HERI
Regional Solicitor

BENJAMIN T. CHINNI
Associate Regional Solicitor

_____

> HEMA STEELE (0081456)
> Senior Trial Attorney
>
> JOSEPH M. BERNDT
> Trial Attorney
>
> U.S. Department of Labor
> Office of the Solicitor
> 1240 East Ninth Street, Room 881
> Cleveland, Ohio 44199
> (216) 522-7546/(216) 522-3875
> (216) 522-7172 (facsimile)
> *Steele.Hema@dol.gov*
> *Berndt.Joseph.M@dol.gov*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing *Secretary's First Amended Complaint* was served upon all attorneys of record electronically, via the Court's CM/ECF System on June 26, 2018. Parties may access this filing through the Court's system.

> _____
> Hema Steele
> Senior Trial Attorney